IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs April 3, 2018

**ANTONIO CRENSHAW v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
**No. 12-05228        Lee V. Coffee, Judge**

————————————————————

**No. W2017-00940-CCA-R3-PC**

————————————————————

Antonio Crenshaw ("the Petitioner") appeals the Shelby County Criminal Court's denial of post-conviction relief from his conviction of robbery, for which he was sentenced to fifteen years' incarceration. On appeal, the Petitioner contends that he was denied the effective assistance of counsel during trial. Upon review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and J. ROSS DYER, JJ., joined.

Ernest J. Beasley, Memphis, Tennessee, for the appellant, Antonio Crenshaw.

Herbert H. Slatery III, Attorney General and Reporter; Zachary T. Hinkle, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Alanda Dwyer and Kevin McAlpin, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**Factual and Procedural Background**

*Trial*

On direct appeal, this court summarized the facts presented at trial as follows:

Cyrine Howard testified that on February 17, 2012, she was the store manager of a Roses Department Store in Memphis. On the morning of February 17, 2012, Monica Foster, one of the office managers, informed Howard that a man, later identified as [the Petitioner], had "got[ten] something," which meant that [the Petitioner] was attempting to steal merchandise. Although Howard did not know [the Petitioner's] name, she recognized him as a regular customer at the store. Howard said that when she had seen [the Petitioner] in the store on prior occasions, he was "walking real slow, and he'd just look around. So I thought he was on medication or something." When Howard was asked if she believed [the Petitioner] was "up to something" on those previous occasions, Howard responded, "No ma'am. I just thought he was sick or something, he was on medication." She added, "He had been in the store lots of times, so I didn't think anything about it. I just thought he was a regular customer."

When Foster informed Howard that [the Petitioner] was attempting to take some merchandise without paying for it, Howard looked up from the work she was doing. The store's cashier, Mary Blaire, approached [the Petitioner], who had a trash can full of clothing, and told him to leave it there. When Howard saw that [the Petitioner] was not going to leave the items, she ran to the entrance of the store to stop him from leaving the store with the store's merchandise, which included both the trash can and the clothing. As soon as she got there, Howard told [the Petitioner] to leave the merchandise, and [the Petitioner] informed her that he was not going to leave it. Howard said that at that point "[the Petitioner] pushed the trash can up against me, and we went to tussling over the trash can." She added, "I thought [the Petitioner] was going to turn loose and hit me, but he didn't." Howard said she believed [the Petitioner] was going to hit her when he attempted to exit the store's second door to the outside.

[The Petitioner] refused to release the trash can and informed Howard that he was going to keep the trash can and its contents. During the struggle over the trash can, Foster approached them, and Howard asked her if she was going to help her. Howard said she was unable to hold her grip on the trash can because [the Petitioner] was relentlessly pulling on it. Finally, [the Petitioner] snatched the trash can from Howard, ran out of the store, and threw the trash can and its contents into the back seat of a black Chrysler 300 that was waiting nearby. [The Petitioner] jumped inside the passenger seat of the car, which immediately drove away from the scene. Howard identified [the Petitioner] at trial as the man who had taken the merchandise from the store on February 17, 2012. A surveillance

videotape, which depicted [the Petitioner] during the incident on February 17, 2012, was shown to the jury.

Howard later identified [the Petitioner] from a police photographic lineup. Several days after Howard identified [the Petitioner] in this lineup, [the Petitioner] approached Howard at the store, told her his name was Tony, and asked her not to press charges against him. Because Howard was frightened that [the Petitioner] might hurt her, she began talking to him about turning his life around. A few days later, Howard told the prosecutor about [the Petitioner] returning to the store and about the details of their conversation.

Near the end of Howard's testimony, the trial court relayed the following question to Howard from a juror: "What made you feel as though [the Petitioner] was going to hit you?" Howard replied, "He said he wasn't going to let [the trash can with the merchandise] go when I asked him to leave it. And as me being a woman and him being a male, I assumed he would try to hit me. But he didn't."

Monica Foster testified that on February 17, 2012, she was working at the Roses Department Store in Memphis when she observed [the Petitioner] pulling a garbage can full of merchandise. She told Howard that [the Petitioner] "ha[d] something," and Blaire, the cashier, told [the Petitioner] to stop, although he continued with the merchandise to the front of the store. Howard approached [the Petitioner], and Foster followed behind. Foster said Howard told [the Petitioner] to drop the garbage can, and he refused. At that point, [the Petitioner] and Howard began fighting over the garbage can. Foster said that she was unable to grab onto the garbage can because of the way they were fighting over it.

When asked if she thought [the Petitioner] was going to hurt Howard, Foster replied, "The way I was looking—I was like—I didn't know what [the Petitioner] was going to do, but he was determined to get the garbage can." When asked if she was afraid or was watching what was happening, she said, "Well, I [was] watching. I was hoping he wasn't going to do anything to her, you know." Foster said that during the altercation, nearly six hundred dollars of clothing fell out of the garbage can. Despite this, Foster said the garbage can was still nearly full of merchandise when [the Petitioner] exited the store with it. After [the Petitioner] fled with the merchandise, Foster notified the police that [the Petitioner] had dropped his hat and a business card during the incident.

Nancy Trentham, an officer with the Memphis Police Department, testified that she collected a black hat and a business card with Officer Croom's name on it from the Roses Department Store when she investigated this case on February 17, 2012. She later contacted Officer Croom to notify him that his business card was found at the crime scene.

Joshua Croom, an officer with Organized Crime Unit of the Memphis Police Department, testified that he first met [the Petitioner] during a traffic stop just prior to midnight on February 16, 2012. During this stop, [the Petitioner] told Officer Croom that he needed a job to make some money, and Officer Croom made him an offer to work as a confidential informant for his unit and gave him his business card. Officer Croom identified the card collected by Officer Trentham as one of his business cards. When he gave [the Petitioner] his business card, he wrote down [the Petitioner's] name and date of birth. A few hours later, he received a call from Officer Trentham that his business card had been found at the scene of a robbery. Officer Croom later reviewed a surveillance videotape from the Roses Department Store and identified [the Petitioner] as the man in the videotape and as the man to whom he gave his card during the traffic stop. He noted that [the Petitioner] was wearing the same clothes in the videotape as he had been wearing during the traffic stop.

Dexter Moses, a lieutenant with the Memphis Police Department, testified that in February 2012 he worked in the Robbery Bureau. When he learned that Officer Croom's business card had been found at the scene of a robbery at the Roses Department Store on February 17, 2012, he contacted Officer Croom to see if he had recently talked to someone about being a confidential informant. He then asked Officer Croom to look at the surveillance videotape from the robbery. Based on Officer Croom's information, Lieutenant Moses compiled a photographic lineup, which he presented to Howard. He stated that Howard immediately identified [the Petitioner] in the lineup and that he later issued an arrest warrant for [the Petitioner].

*State v. Antonio Crenshaw*, No. W2014-01367-CCA-R3-CD, 2015 WL 2447717, at *1-3 (Tenn. Crim. App. May 22, 2015) (footnote omitted), *perm. app. denied* (Tenn. Sept. 18, 2015). Based on this evidence, the jury convicted the Petitioner of robbery, and the trial court sentenced the Petitioner, as a Range III persistent offender, to fifteen years. *Id.* at *1. This court affirmed the Petitioner's judgment of conviction on direct appeal, and the Tennessee Supreme Court denied the Petitioner's application for further review. *Id.*

*Post-Conviction Proceedings*

The Petitioner filed a timely pro se petition for post-conviction relief. Following the appointment of counsel, the Petitioner filed an amended petition. At the post-conviction hearing, the post-conviction court initially explained:

> My recollection is this case was transferred from Division X. I believe [the Petitioner] had actually entered a guilty plea in Division X to a much lesser sentence. [The Petitioner] [c]onvinced Judge Beasley that he wanted to withdraw his guilty plea. Judge Beasley allowed [the Petitioner] to withdraw this guilty plea. The case was transferred to this court for trial. And [the Petitioner] has filed a variety of post-conviction, post-sentencing motions in this Court since this case has been affirmed on appeal by the Court of Criminal Appeals.

The Petitioner testified that trial counsel was appointed to represent him while his cases were pending in Division X and that it was originally set for trial. The Petitioner eventually entered a guilty plea in exchange for a four-year sentence, but he later filed a motion to set aside the guilty plea. The Petitioner explained that he filed the motion to set aside the guilty plea because it had been his understanding that another case, in which the Petitioner was charged with forgery, was dismissed with prejudice as part of the plea agreement. The Petitioner was serving his sentence at the penal farm when he learned that he had been indicted on the forgery charge.

The Petitioner stated that, on the Friday before his trial, he was never told that the State again offered a four-year sentence, plus the time served, nor was he told that the offer would not be available on Monday—the day the trial was originally scheduled to begin. During the trial, trial counsel did not call any witnesses, and the Petitioner did not testify. The Petitioner stated that trial counsel failed to file a written request to include a lesser-included offense of shoplifting in the jury instructions. However, the Petitioner testified that trial counsel "did the best that he [could] do[.]" The Petitioner testified, "I came in this courtroom set for trial. . . . That offer wasn't brought to me." The Petitioner did not recall the trial court's discussing the State's offer with him and explaining to the Petitioner his range of punishment and "what could happen to [the Petitioner] after trial." The Petitioner said that if he "had that offer at first, four years and dismiss the other charge. That's the same offer. I would have [taken] that."

The Petitioner agreed that trial counsel requested a jury instruction on shoplifting, which was denied by the trial court, and that trial counsel raised the issue on direct appeal. However, because the request was not made in writing, the issue was reviewed

- 5 -

only for plain error. The Petitioner stated that, other than trial counsel's failure to make a written request for the shoplifting instruction, trial counsel "did a good job" on his case.

Trial counsel testified that he had practiced law since 2011 and, at the time of his appointment to the Petitioner's case, his practice was seventy percent criminal defense. He recalled that the Petitioner's case was initially set for trial. Trial counsel explained that the Petitioner had two cases initially:

> He had a theft of property case . . . that involved a car, and the argument of the [S]tate was that he had stolen a car, and I believe we had documentation to show [the Petitioner] had purchased it from somebody for a reduced price. The car was not working. [I] [d]id not believe that there was anything inappropriate with his conduct as far as obtaining the car. So, that was case number one.

> . . . .

> Then the second case we had was this robbery, which involved [the Petitioner] obtaining merchandise in the store, placing it in the cart, trashcan, and that being a robbery. So we had those two cases that [were] . . . before the Court.

Trial counsel explained that the Petitioner also had a forgery case, but the trial court entered an order dismissing the case based on the prosecutor's comments that it would not be pursued. Ultimately, the State offered the Petitioner an effective four-year sentence to resolve the theft and the robbery charge. Trial counsel recalled that, when the State later indicted the Petitioner on the forgery charge, the Petitioner filed a motion to withdraw his guilty plea, which the trial court granted. Trial counsel testified that he explained to the Petitioner that he was facing "a lot more time" if he took the cases to trial. He recalled that, on the Friday before trial, the trial court brought the Petitioner into the courtroom and "asked the State what the offer was, and after being told what the offer was, Judge Coffee looked at the jacket, and discussed [] his potential range of punishment, and clarified that the State would have to prove the range of punishment." The Petitioner rejected the State's offer and proceeded to trial. However, on the first day of trial, the Petitioner told trial counsel that he wanted to accept the State's offer. Trial counsel testified that the offer was no longer available at that time.

At the conclusion of the hearing, the post-conviction court specifically accredited trial counsel's testimony and discredited the Petitioner's testimony. The post-conviction court stated:

For the record, as the court had indicated earlier, this case has a lot of history. The case started in Criminal Court Division X. [The Petitioner] had entered a guilty plea before Judge Beasley, and [the Petitioner] decided he wanted to withdraw the guilty plea.

[Trial counsel] filed a motion in Division X to set aside his guilty plea, alleging that the [Petitioner] had entered a guilty plea to an effective sentence of four years, range one. [The Petitioner] [t]hought he was disposing of all his cases, putting his legal problems behind him. . . . Representations were made on and off the record that the [S]tate and the [Petitioner] were attempting to resolve all of the [Petitioner's] legal matters.

After pleading guilty, [the Petitioner] was indicted on a new arrest, which was previously dismissed, apparently, by Judge Beasley. The new arrest was indictment 13-02389. [The Petitioner] [i]ndicated that he did not know that it was possible to be indicted on this matter, because he believed that these cases had, in fact, been dismissed.

. . . .

[Trial counsel] . . . convinced Judge Beasley to set aside this guilty plea[.] And Judge Beasley entered a written order on July 18th, 2013, indicating that [the Petitioner] pled guilty on May 17th, 2013, [and] filed a motion to set aside his plea on June 6th, 2013, pursuant to Rule 32 of the Rules of Criminal Procedure. The hearing was conducted on July 18th. The Court determined that the plea had been entered based upon the [Petitioner's] opinion that all of his cases were disposed. In fact, he had another case pending, unknown to him. The [Petitioner] testified that he would not have pled if he knew the other case was pending. The [trial c]ourt [found] that a manifest injustice would occur if the pleas were allowed to stand. The [trial c]ourt, therefore, set aside the above guilty pleas pursuant to Rule 32, and the case [was] set for trial.

. . . .

[The Petitioner's] case was transferred to this Court. . . . I had that conversation with [the Petitioner]. [The Petitioner] and everyone else in this courtroom never have and never will proceed to a trial unless I have that discussion with a defendant themselves, saying, "This is what your offer is. This is what your range of punishment is." I need to make sure -- and I do make sure that [the Petitioner] understands that he's making an

informed and intelligent decision when he tells me that he's rejecting the [S]tate's offer, and he's insisting on a trial.

[The Petitioner] understood that. I'm finding that he clearly understood that. And I find that [the prosecutor] did, with [trial counsel's] consent, talk to [the Petitioner], emphasizing again what his offer was. And [the Petitioner] turned down that offer again.

. . . [W]hen the jury was in the hallway being selected, he changed his mind, and said, "I'll take that offer," even though [the Petitioner] now says, "I never had that offer." And I find that [trial counsel's] testimony is, in fact, true. I find that [the Petitioner's] statements are either intentionally false, or he's hiding behind, "I don't remember. I have a bad memory."

And [the Petitioner], after he demanded that his four-year guilty plea be vacated, this case was tried. This Court informed [the Petitioner] of the possible consequences of that plea, telling [the Petitioner] he was a range three offender, he was facing a minimum of ten years in prison to a maximum of fifteen years in prison. And, notwithstanding the Court's admonitions, [the Petitioner] insisted on trying this case to a jury.

And, when [the Petitioner] was convicted by a jury, this Court set [the Petitioner's] punishment at fifteen years' confinement in the Tennessee Department of Correction as a persistent range three offender for the offense of robbery. This conviction was ordered to be served consecutively to a two-year sentence, 12-02489, theft of property, D felony, for which he entered a guilty plea on November 19th, 2014.

. . . .

[The Petitioner], as indicated earlier, is the architect of his own predicament. [The Petitioner] made the decisions to go to trial. He made the decisions to voluntarily reject the offer that he had agreed to in Division X, to reject the State's offer that they allowed to be on this table until Tuesday when that jury was in the hallway. [The Petitioner] made these decisions.

[The Petitioner] is suffering from a classic case of buyer's remorse, in that [the Petitioner] went to trial thinking that he could be convicted of a lesser charge of theft of property, or theft of merchandise, or shoplifting, rolled the dice, and he came up with this predicament that I told him that,

- 8 -

"If you're convicted, and based on your record . . . you're facing a lot more time in prison than what the [S]tate has allowed you to enter a guilty plea to." That's the decision that he made. That the decision that he made intelligently, knowingly, freely, voluntarily.

. . . .

And the proof in this case was overwhelming. It was recovered -- recorded, rather, on video tape, and all these issues as to whether or not the video tape should have been admitted, the definition of theft of property, whether or not theft of merchandise should have been charged, all of that has been previously determined to the detriment of [the Petitioner].

. . . .

[The Petitioner] has wholly failed to establish that he was prejudiced by the alleged ineffective representation of [trial counsel]. [Trial counsel] is . . . one of the most thorough lawyers I've ever met. He is one of the most argumentative lawyers I've ever met. Persistent. Very pleasant, but very persistent, and very argumentative.

. . . .

But I will find for the record that, not only was he effectively represented, he has failed to prove that he was prejudiced by [trial counsel's] representation, and [trial counsel] did a great job in representing [the Petitioner]. [Trial counsel] could not make [the Petitioner] do something that was reasonable, do something that was prudent, do something that would have been wise, to say, "Let me take this four-year offer," and [the Petitioner] made these decisions.

The post-conviction court subsequently entered a written order denying post-conviction relief. This timely appeal follows.

## Analysis

On appeal, the Petitioner contends that trial counsel's representation fell below the standard set forward in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). The Petitioner asserts that, due to counsel's representation, he was "confused about the nature of his case[,]" and he "received more time than he should have[,] had he pled guilty."

In order to prevail on a petition for post-conviction relief, a petitioner must prove all factual allegations by clear and convincing evidence. *Jaco v. State*, 120 S.W.3d 828, 830 (Tenn. 2003). Post-conviction relief cases often present mixed questions of law and fact. *See Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). Appellate courts are bound by the post-conviction court's factual findings unless the evidence preponderates against such findings. *Kendrick v. State*, 454 S.W.3d 450, 457 (Tenn. 2015). When reviewing the post-conviction court's factual findings, this court does not reweigh the evidence or substitute its own inferences for those drawn by the post-conviction court. *Id.*; *Fields*, 40 S.W.3d at 456 (citing *Henley v. State*, 960 S.W.2d 572, 579 (Tenn. 1997)). Additionally, "questions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the [post-conviction court]." *Fields*, 40 S.W.3d at 456 (citing *Henley*, 960 S.W.2d at 579); *see also Kendrick*, 454 S.W.3d at 457. The trial court's conclusions of law and application of the law to factual findings are reviewed de novo with no presumption of correctness. *Kendrick*, 454 S.W.3d at 457.

The right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. In order to receive post-conviction relief for ineffective assistance of counsel, a petitioner must prove: (1) that counsel's performance was deficient; and (2) that the deficiency prejudiced the defense. *Strickland* 466 U.S. at 668, 687; *see State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (stating that the same standard for ineffective assistance of counsel applies in both federal and Tennessee cases). Both factors must be proven in order for the court to grant post-conviction relief. *Strickland*, 466 U.S. at 687; *Henley*, 960 S.W.2d at 580; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Accordingly, if we determine that either factor is not satisfied, there is no need to consider the other factor. *Finch v. State*, 226 S.W.3d 307, 316 (Tenn. 2007) (citing *Carpenter v. State*, 126 S.W.3d 879, 886 (Tenn. 2004)). Additionally, review of counsel's performance "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689; *see also Henley*, 960 S.W.2d at 579. We will not second-guess a reasonable trial strategy, and we will not grant relief based on a sound, yet ultimately unsuccessful, tactical decision. *Granderson v. State*, 197 S.W.3d 782, 790 (Tenn. Crim. App. 2006). As to the first prong of the *Strickland* analysis, "counsel's performance is effective if the advice given or the services rendered are within the range of competence demanded of attorneys in criminal cases." *Henley*, 960 S.W.2d at 579 (citing *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)); *see also Goad*, 938 S.W.2d at 369. In order to prove that counsel was deficient, the petitioner must demonstrate "that counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing

professional norms." *Goad*, 938 S.W.2d at 369 (citing *Strickland*, 466 U.S. at 688); *see also Baxter*, 523 S.W.2d at 936.

Even if counsel's performance is deficient, the deficiency must have resulted in prejudice to the defense. *Goad*, 938 S.W.2d at 370. Therefore, under the second prong of the *Strickland* analysis, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* (quoting *Strickland*, 466 U.S. at 694) (internal quotation marks omitted).

Trial counsel has a duty to timely communicate formal plea offers to a defendant, *see Missouri v. Frye*, 566 U.S. 134, 145 (2012), and to render effective assistance in advising a defendant whether to accept a plea offer, *see Lafler v. Cooper*, 566 U.S. 156, 162 (2012).

In this case, the proof at the post-conviction hearing established that trial counsel and the prosecutor discussed the four-year plea offer with the Petitioner on the Friday before the Petitioner's trial. The Petitioner was told that, if he did not accept the offer that day, it would no longer be available to him. Additionally, the trial court engaged in a colloquy with the Petitioner and advised the Petitioner of the offer and the potential sentence that the Petitioner could receive if convicted at trial. The Petitioner decided to proceed to trial. At trial, the Petitioner inquired about the availability of the plea offer, but he was told it was no longer available. Although the Petitioner testified that he could not recall the advice from trial counsel and the trial court regarding the four-year offer and his potential sentence if convicted at trial, the post-conviction court specifically discredited the Petitioner's claim, noting that the Petitioner's prior declarations under oath before trial conflicted with his testimony at the post-conviction hearing. The Petitioner has not established that trial counsel's performance was deficient in any respect. Accordingly, the post-conviction court properly denied relief. *Strickland*, 466 U.S. at 687.

## Conclusion

For the aforementioned reasons, the judgment of the post-conviction court is affirmed.

_____
ROBERT L. HOLLOWAY, JR., JUDGE